

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 12, 2014**

**United States Bankruptcy Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 12-38039-BJH |
| PROVIDERX OF GRAPEVINE, LLC, | § | (Chapter 11) |
| | § | |
| DEBTOR. | § | |
| _____ | § | |
| | § | |
| CERx PHARMACY PARTNERS, LP, | § | ADV. PROC. NO. 13-03015-BJH |
| | § | |
| PLAINTIFF, | § | Related to Dkt. Nos. 53 and 66 |
| v. | § | |
| | § | |
| PROVIDER MEDS, LP, ET AL., | § | |
| | § | |
| DEFENDANTS, | § | |
| | § | |
| v. | § | |
| | § | |
| CARY LORIMER AND STEWART STEPHENS, | § | |
| | § | |
| THIRD PARTY DEFENDANTS. | § | |

## MEMORANDUM OPINION GRANTING MOTION FOR RECONSIDERATION AND, UPON RECONSIDERATION, ADDRESSING MOTIONS FOR PARTIAL SUMMARY JUDGMENT

Before the Court are the *Plaintiff's Amended Motion for Reconsideration or New Trial and Brief* (the "**Motion for Reconsideration**") [Dkt. No. 136] filed by CERx Pharmacy Partners, LP ("**CERx**") in which CERx requests that this Court modify its *Memorandum Opinion* entered August 2, 2013 (the "**Original Memorandum Opinion**"), the *Trustees' Response to Plaintiff's Amended Motion for Reconsideration or New Trial* [Dkt. No. 139] filed by the Chapter 7 trustees of the various debtor-Defendants' bankruptcy estates (collectively, the "**Trustees**"),[1] and the various replies and post-hearing briefs related thereto. The Court held a hearing on the Motion for Reconsideration on January 8, 2013. At the conclusion of the hearing, the Court ordered additional briefing on several issues. The last of those briefs was filed on January 17, 2014. The Motion for Reconsideration is now ripe for ruling.

## I. PROCEDURAL HISTORY

On June 17, 2013, the Court held a hearing to consider the *Defendants' Partial Motion for Summary Judgment* [Dkt. No. 53] and brief in support ("**Defendants' Brief**") [Dkt. No. 54] filed by ProvideRx of Grapevine, LLC, Provider Meds, LP ("**PM**"), Provider Technologies, Inc. ("**PT**"), OnSite RX of Phoenix, LLC, W PA Onsite RX, LLC, ProvideRx of Midland, LLC, ProvideRx of Waco, LLC, ProvideRx of San Antonio, and Reef Gillum as trustee of the Gillum Family Master Heritage Trust (collectively with OnSiteRx, Inc.,[2] the "**Defendants**"), *Plaintiff's*

---

[1] The following Defendants are currently debtors in bankruptcy proceedings pending before this Court: OnSiteRx, Inc. (13-30267), ProvideRx of Grapevine, LLC (12-38039), Provider Technologies, Inc. (13-33020), Provider Meds, LP (13-30678), ProvideRx of Midland, LLC (13-33016), ProvideRx of Waco, LLC (13-33017), ProvideRx of San Antonio LLC (13-33018), and W PA OnSiteRx, LLC (13-32615). The debtor-Defendants' bankruptcy cases were converted from Chapter 11 to Chapter 7 on or about August 30, 2013. A Chapter 7 trustee was subsequently appointed in each case.

[2] Although OnSiteRx, Inc. ("**OnSiteRx**") is a debtor-Defendant, it is not a party to the Defendants' Partial Motion for Summary Judgment.

*Motion for Partial Summary Judgment* [Dkt. No. 66] and brief in support ("**Plaintiff's Brief**") [Dkt. No. 67] filed by CERx, and the responses and replies related thereto.

At the conclusion of the hearing, this Court orally granted CERx's request for entry of a judgment against the Gillum Family Master Heritage Trust ("**GFMHT**")[3] for $10,301,130.81, plus interest at a rate of $4,739.36 per day since March 31, 2013, for sums GFMHT owes CERx under various continuing, unconditional, and unlimited payment guaranties GFMHT executed in favor of CERx covering PM's debts to CERx. The Court also orally granted CERx's request for a judgment in this amount against PT, as PM's general partner, for the debts owed to CERx by PM. Accordingly, on June 26, 2013, this Court entered a *Partial Summary Judgment* [Dkt. No. 100] reflecting these rulings. The Court also requested supplemental briefing from the parties on several remaining issues at the conclusion of the hearing. By agreement of the parties, the last of those supplemental briefs was submitted on July 3, 2013, and the motions were taken under advisement.

The Court issued the Original Memorandum Opinion on August 2, 2013, in which it found that: (1) the loan documents are unambiguous and, as a matter of law, PM did grant CERx a security interest in all of its IP Assets (as defined on p. 7); (2) although CERx's security interest attached to PM's IP Assets, the collateral description contained in the UCC-1 financing statement filed by CERx with the Texas Secretary of State was insufficient to perfect CERx's security interest in PM's IP Assets, other than the Patent Applications (as defined on p. 21); (3) pursuant to its Notice of Disposition (as defined on p. 23), CERx only disposed of PM's Patent Applications; (4) thus, as of its bankruptcy petition date, PM held title to all of its IP Assets, other than the Patent Applications, subject to CERx's unperfected security interest; and (5)

---

[3] In their pleadings, the Defendants refer to GFMHT as "Gillum Master Family Heritage Trustee" and "Gillum Master Family Heritage Trust." The trust's proper name appears to be "Gillum Family Master Heritage Trust."

because CERx failed to perfect its non-Patent Application security interests, such interests were unperfected when PM filed its bankruptcy case and are subject to avoidance pursuant to 11 U.S.C. § 544(a)(1). Original Memorandum Opinion at 3. On September 12, 2013, CERx filed the Motion for Reconsideration.

At the conclusion of the January 8, 2014 hearing on the Motion for Reconsideration,[4] the Court ordered additional briefing on the issues of: (1) whether the Court could read the Transmittal Letter (as defined on p. 22) in conjunction with the Notice of Disposition in order to determine the scope of CERx's December 13, 2012 disposition of collateral, and (2) whether failure to provide a notice of disposition to all parties required to be given notice under the Texas UCC is grounds to void or otherwise rescind the disposition of collateral. Further, CERx was to include within its post-hearing brief citations to the portions of the summary judgment record connecting the source code referenced in the Transmittal Letter to the Source Code (as defined on p. 20) at issue here. As noted previously, CERx and the Trustees submitted their post-hearing briefs on January 17, 2014. Notably, the Trustees' brief expressly conceded CERx's argument on both points:

> As a result, with respect to the validity of the foreclosure as to the ownership interest, if any, of Provider Meds, the Trustees believe that the answer to issue (1) is "yes" and that the answer to issue (2) is "no." Since the Trustees agree with the Court's tentative rulings with respect to the validity of the foreclosure as to the ownership interests, if any, of Provider Meds, we believe that there is no need to submit briefing on these issues.

*Briefing of Legal Issues Discussed at January 8, 2014 Hearing* [Dkt. No. 150] at 1. Further, CERx's post-hearing brief provided the Court with sufficient references to the summary judgment record to show that the source code referenced in the Transmittal Letter is the Source

---

[4] Plaintiff filed the Motion for Reconsideration on September 12, 2013, and set the matter for status conference on October 25, 2013 [Dkt. No. 143]. Plaintiff later withdrew its notice of the status conference [Dkt. No. 144], and did not re-notice the Motion for Reconsideration until it gave notice of the January 8, 2014 hearing on December 11, 2013 [Dkt. No. 146].

Code at issue here.[5]  *See Plaintiff's Brief Tracing the Source Code Referred to in CERx's Transmittal Letter to the Source Code in the Court's Registry* [Dkt. No. 149] at ¶ 5.

## II.    LEGAL ANALYSIS

### A.    The Motion for Reconsideration

CERx failed to cite to the rule of procedure under which it would have the Court revisit the Original Memorandum Opinion, only stating that the Motion for Reconsideration is brought to correct a manifest error of law.  *Plaintiff's Reply Regarding its Amended Motion for Reconsideration or New Trial and Brief* ("**Reply Regarding Motion for Reconsideration**") [Dkt. No. 142] at 1.   To decide which rule of procedure applies to the Motion for Reconsideration, and thus the relevant legal standard to apply, the Court must consider the nature of its decision as set forth in the Original Memorandum Opinion.  If it was a final judgment, Fed. R. Civ. P. 59(e) would apply.   However, the Original Memorandum Opinion was an interlocutory decision, as it addressed partial summary judgment motions and did not finally dispose of all issues raised in this adversary proceeding.  *See Moody v. Seaside Lanes*, 825 F.2d 81, 85 (5th Cir. 1987) (explaining that only the resolution of an entire adversary proceeding is "final").   Interlocutory orders are reconsidered under Fed. R. Civ. P. 54(b), as made applicable to adversary proceedings by Fed. R. Bankr. P. 7054(a).  *See* FED. R. CIV. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties ... may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.").

Although the precise standard for evaluating a motion to reconsider under Rule 54(b) is unclear, whether to grant such a motion rests within the discretion of the court and the standard

---

[5] As discussed in more detail below, a genuine issue of material fact remains regarding whether PM or OnSiteRx owned the Source Code on December 13, 2012.  That issue will be determined at trial.

appears to be less exacting than that imposed by Rules 59 and 60. *Dos Santos v. Bell Helicopter Textron, Inc. Dist.,* 651 F.Supp.2d 550, 552 (N.D. Tex. 1991). "Even so, considerations similar to those under Rules 59 and 60 inform the Court's analysis." *Id.* That is, considerations such as whether the movant is attempting to rehash its previously made arguments or is attempting to raise an argument for the first time without justification bear upon a court's review of a motion for reconsideration under Rule 54(b). *Id.*

CERx summarizes its argument in its Reply Regarding Motion for Reconsideration, where it argues that portions of the Original Memorandum Opinion reflect a manifest error of law because:

> (1) a defect in the sale process would be an affirmative defense that PM never pled, was not raised in the motions or briefs, and was not properly before the Court; (2) the Opinion fails to recognize that actual notice would suffice; (3) Trustees admit that PM had actual notice; and (4) sufficiency of notice does not affect the transfer of title. For these reasons alone, the Court should modify the Opinion to hold that CERx acquired all of PM's IP Assets no later than by the December 13, 2012 sale.

Reply Regarding Motion for Reconsideration at ¶ 2.

As discussed in more detail below, the Court agrees that it erred in analyzing the sufficiency of the notice CERx provided to PM prior to conducting a public sale of the collateral PM had pledged to secure repayment of its notes under the May 6 Loan Documents. In the Original Memorandum Opinion, the Court read the Notice of Disposition in isolation and concluded that PM only received notice of CERx's intent to dispose of the Patent Applications. The Court now recognizes that the Notice of Disposition must be read together with the Transmittal Letter, and when these documents are read together PM did, in fact, have actual notice of CERx's intent to dispose of all of PM's IP Assets, and that such notice was sufficient to dispose of PM's interests in the IP Assets at the December 13, 2012 public sale. *See infra* pp. 44-46. As such, this Court's prior finding that PM did not have notice of CERx's intent to

dispose of all of PM's IP Assets was a manifest error of fact. And, as just explained, that manifest error of fact arose from a manifest error of law – *i.e.,* that the Notice of Disposition had to be construed in isolation. Further, although a deficiency in the Notice of Disposition could give rise to damages, such deficiency would not be grounds to void or otherwise rescind the sale. *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 456 (Tex. App. – Houston [14th Dist.] 1998) (decided under former Article 9).

For the foregoing reasons, the Court will grant the Motion for Reconsideration and vacate the Original Memorandum Opinion. Now that the Motion for Reconsideration has been granted and the Original Memorandum Opinion vacated, the Court must return to the motions for partial summary judgment and decide them once again.

### B.    The Motions for Partial Summary Judgment[6]

As before, the primary issue remaining before this Court on summary judgment is whether the language in the loan and security documents entered into by and among the various parties was sufficient to grant CERx a security interest in all of PM's intellectual property assets owned immediately prior to a December 13, 2012 disposition of collateral by public sale held by CERx (collectively, the "**IP Assets**"). For the reasons detailed below, this Court concludes that (1) the loan documents are unambiguous and, as a matter of law, PM did grant CERx a security interest in all of its IP Assets; (2) although CERx's security interest attached to PM's IP Assets, the collateral description contained in the UCC-1 financing statement filed by CERx with the Texas Secretary of State was insufficient to perfect CERx's security interest in PM's IP Assets, other than the Patent Applications; (3) pursuant to its Notice of Disposition and accompanying Transmittal Letter, CERx disposed of PM's IP Assets on December 13, 2012 by public sale; and

---

[6] This Memorandum Opinion supersedes in its entirety the Original Memorandum Opinion addressing the motions for partial summary judgment issued on August 2, 2013 [Dkt. No. 124].

(4) because the IP Assets had been purchased by CERx at the December 13, 2012 public sale, the IP Assets were no longer owned by PM on the date that it filed for Chapter 11 protection and did not become property of the PM bankruptcy estate; accordingly, the Chapter 7 trustee of PM's bankruptcy estate may not avoid CERx's unperfected lien on the IP Assets pursuant to 11 U.S.C. § 544.

Based upon the summary judgment record, however, the Court finds that a genuine issue of material fact exists regarding exactly what assets, other than the Patent Applications, comprised PM's IP Assets on December 13, 2012. Accordingly, as set forth in more detail below, *Plaintiff's Motion for Partial Summary Judgment* will be granted with respect to PM's IP Assets, the scope of which will be determined after trial, and *Defendant's Partial Motion for Summary Judgment* will be denied.

## 1. Summary Judgment Standard

In deciding a motion for summary judgment, a court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56, as made applicable by FED. R. BANKR. P. 7056. In deciding whether a fact issue has been raised, the facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Berquist v. Washington Mut. Bank,* 500 F.3d 344, 349 (5th Cir. 2007). A court's role at the summary judgment stage is not to weigh the evidence or determine the truth of the matter, but rather to determine only whether a genuine issue of material fact exists for trial. *Peel & Co., Inc. v. The Rug Market,* 238 F.3d 391, 394 (5th Cir. 2001) ("the court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence") (citing *Reeves v.*

*Sanderson Plumbing Prods, Inc.*, 530 U.S. 133,135 (2000)); *see also U.S. v. An Article of Food Consisting of 345/50 Pounds Bags*, 622 F.2d 768, 773 (5th Cir. 1980) (the court "should not proceed to assess the probative value of any of the evidence...."). While courts must consider the evidence with all reasonable inferences in the light most favorable to the non-movant, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pylant v. Hartford Life and Acc. Ins. Co.,* 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

After the movant has presented a properly supported motion for summary judgment, the burden then shifts to the nonmoving party to show with "significant probative evidence" that there exists a genuine issue of material fact. *Hamilton v. Segue Software Inc.,* 232 F.3d 473, 477 (5th Cir. 2000) (internal citation omitted). However, where "the burden at trial [as to the material fact at issue] rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case." *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 174 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

On cross-motions for summary judgment, the court must review each party's motion independently, and view the evidence and inferences in the light most favorable to the non-moving party. *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994).

2. **Objections to the Summary Judgment Record**

    a. **CERx's Objections to the Affidavit of Reef Gillum, D.O.**

CERx objects to and requests that this Court strike all of paragraphs 3 and 7, and portions of paragraph 4, of Dr. Reef Gillum's affidavit [Dkt. No. 54-1] on the grounds that the specified statements are unsupported conclusions and/or not based upon facts. *Objections to Affidavit of Reef Gillum, D.O.* [Dkt. No. 64] at ¶¶ 1-3. The first sentence of paragraph 3, "[o]ur contention is that the Source [Code] is the property of OnSite RX, Inc.," and all of paragraph 7, "[i]n short Defendants submit that …," are worded so that they do not reflect statements based upon Dr. Gillum's personal knowledge. The second sentence of paragraph 3 and the third sentence of paragraph 4 of Dr. Gillum's affidavit state his opinion as to the ultimate legal issue before this Court. In these sections, Dr. Gillum testifies as to the alleged scope of the security interests granted to CERx pursuant to the May 6 Loan Documents (as defined on p. 20) and which assets were allegedly the subject of CERx's December 13, 2012 disposition of collateral.

"Under Fed. R. Evid. 701, a lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the jury." *U.S. v. Riddle*, 103 F.3d 423, 428 (5th Cir. 1997) (internal quotation marks and citation omitted). A lay witness may not give an opinion that requires "scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701(c). It is also generally prohibited for a lay witness to interpret statutes and to give legal opinions. *See U.S. v. Griffin*, 324 F.3d 330, 347-48 (5th Cir. 2003). For example, in *Riddle*, the Fifth Circuit held that it was improper for a lay witness in a bank fraud prosecution to explain provisions of the banking regulations, to express his opinion on "prudent" banking practices, and to "draw on his specialized knowledge as a bank examiner" in giving his opinions about the defendant's actions. *Riddle*, 103 F.3d at

428–29; *see also U.S. v. El-Mezain*, 664 F.3d 467, 511-12 (5th Cir. 2011) (holding that a lay witness may give opinions that require specialized knowledge, but the witness must draw straightforward conclusions from observations informed by his own experience). Here, Dr. Gillum is not a lawyer and has no specialized training or knowledge of the law that would permit him to so testify in accordance with Fed. R. Evid. 701(c). Accordingly, CERx's objection is sustained and the above-referenced portions of Dr. Gillum's affidavit are stricken from the summary judgment record.

**b.** **The Defendants' Objection to Plaintiff's Summary Judgment Evidence**

The Defendants object to CERx Exhibits 89 [CERx App. 815], 94 [*Id.* at 678-682], 95 [*Id.* at 683-684], 116 [*Id.* at 731-736], 117 [*Id.* at 737-743], 118 [*Id.* at 827-828], 128 [*Id.* at 793-796], 129 [*Id.* at 797-804], and 130 [*Id.* at 1185-1186] as inadmissible hearsay. *See Defendants' Objection to Plaintiff's Summary Judgment Evidence* [Dkt. No. 86] at p. 2. CERx responds to this objection in its *Response to Defendants' Objections to Plaintiff's Summary Judgment Evidence* ("**CERx Response to Objections**") [Dkt. No. 93]. With the exceptions of Exhibits 89, 94, and 118, CERx alleges that each of the exhibits subject to the Defendants' objection is excluded from hearsay as an opposing party's statement under Fed. R. Evid. 801(d)(2). CERx alleges that Exhibit 89 is an "adoptive admission" excluded from hearsay under Fed. R. 801(d)(2)(B), citing to *U.S. v. Miller*, 478 F.3d 48, 51 (1st Cir. 2007), and Exhibit 94 is excluded from hearsay as a "verbal act," citing to *U.S. v. Pang*, 362 F.3d 1187, 1192 (9th Cir. 2004). Finally, CERx alleges that Exhibit 118 is excluded from hearsay as an "operative act," again citing to *Pang*, and an opposing party's statement under Fed. R. Evid. 801(d)(2)(B). As the proponent of the evidence, CERx bears the burden of establishing the admissibility of the evidence in support of its claims. *See U.S. v. Roque*, 703 F.2d 808, 812 (5th Cir. 1983).

Exhibit 89 is an email dated July 10, 2012 from Jeff Fink, an attorney representing CERx, to William Meier, an attorney representing PM.  *Second Declaration of Jeffrey P. Fink* at ¶¶ 1, 4; CERx App. at 805, 806.  CERx submits the exhibit as evidence regarding the scope of the collateral granted by the May 6 Loan Documents and claims the email is an exception to hearsay as an adoptive admission.  CERx Response to Objections at 2.  According to *U.S. v. Miller*, 478 F.3d 48 (1st Cir. 2007), as cited by CERx:

> The law of evidence long has recognized "adoptive admissions."  *See, e.g.*, Fed. R. Evid. 801(d)(2)(B).  This doctrine provides that, in certain circumstances, a party's agreement with a fact stated by another may be inferred from (or "adopted" by) silence.  *See id.*; *see also United States v. Fortes*, 619 F.2d 108, 115 (1st Cir. 1980).  Such an inference may arise when (i) a statement is made in a party's presence, (ii) the nature of the statement is such that it normally would induce the party to respond, and (iii) the party nonetheless fails to take exception.  *See United States v. Higgs*, 353 F.3d 281, 309–10 (4th Cir. 2003).  In such an instance, the statement may be considered "adopted" by virtue of the party's failure to respond.  *See, e.g., United States v. Negrón–Narváez*, 403 F.3d 33, 39 (1st Cir. 2005); *cf. United States v. Morillo*, 8 F.3d 864, 872–73 (1st Cir. 1993) ("A defendant that accepts ... without contesting the facts set forth in the [presentence] report can scarcely be heard to complain when the sentencing court uses those facts to make its findings.").

*Id.* at 51.

The Court sustains the Defendants' objection as to CERx Exhibit 89.  The failure of one counsel to respond to an email from another counsel that references "patented software pledged to CERx" in relation to a potential transaction with a third party cannot be found to be a manifestation that the Defendants adopted or believed each statement in the email to be true, especially when the referenced pledge was not the main subject of the email.  This is particularly so in a commercial transaction that spanned multiple years.  In any event, CERx submitted this document as evidence regarding the scope of the collateral granted by the May 6 Loan Documents.  As explained below, the Court concludes that the loan documents are not ambiguous, and parol evidence cannot be admitted to vary the express terms of the documents.

*See Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) ("Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create ambiguity."); *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996) ("Where the contract is unambiguous, extrinsic evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports.") (citations omitted); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus.,* 907 S.W.2d 517, 520 (Tex. 1995) (same).

Exhibit 94 is an email chain among Jeff Fentriss, a manager of FPRx Advisors, LLC, which is the general partner of CERx, third party defendant Cory Lorimer, and others. *Jeff Fentriss Declaration* at ¶¶ 1, 10; CERx App. at 1, 2. Attached to the email are various unexecuted drafts of the Term Sheet. CERx contends that the email and attached drafts are excluded from hearsay as "verbal acts," citing to *U.S. v. Pang*, 362 F.3d 1187 (9th Cir. 2004), and are the "operative documents evidencing the formation of a contract." CERx Response to Objections at 2.

The Court sustains the Defendants' objection to Exhibit 94 for at least two reasons. First, as just explained, the executed loan documents are not ambiguous, so parol evidence is inadmissible. Second, the "formation of the contract" -- *i.e.,* the Term Sheet -- is not in dispute, as the executed Term Sheet is already part of the summary judgment record. CERx App. 66-68. Accordingly, the Court concludes that any prior drafts of the Term Sheet are irrelevant.

Turning to the Defendant's remaining objections, Exhibit 95 is an email chain among Jeff Fentriss, a manager of FPRx Advisors, LLC, which is the general partner of CERx, *Jeff Fentriss Declaration* (the "**Fentriss Declaration**") at ¶ 1; CERx App. at 1, Cary Lorimer, OnSiteRx's former CFO, *Defendants' Amended Answer to Plaintiff's Original Complaint, Affirmative*

*Defenses, Counter-Claims, and Third Party Cross Claims* ("**Defendants' Answer**") at ¶ 178 [Dkt. No. 61], and other individuals. Per CERx, the email is offered to show that the "security interest would cover the proprietary source code." CERx Response to Objection at 2. The only evidence submitted in support of the admission of Exhibit 95 is in paragraph 11 of the Fentriss Declaration, where Mr. Fentriss states "[a]ttached hereto as Ex. 95 is a true and correct copy of a May 6, 2011 Email chain between me, Cary Lorimer, and Paul Ponder." Fentriss Declaration at ¶ 11; CERx App. at 3. In their Answer, however, the Defendants allege that Mr. Lorimer was acting "for his own pecuniary gain" and conspired with CERx to gain access or control of the Defendants' technology. Defendants' Answer at ¶ 178. While these allegations are not evidence, they do put CERx on notice that questions exist as to the actions of Mr. Lorimer being within the scope of his relationship with OnSiteRx and whether Mr. Lorimer was authorized to make the subject statements. As such, the Court concludes that CERx has failed to carry its burden under either Fed. R. Evid. 801(d)(2)(C) or (D). Moreover, the Court further concludes that the May 6 Loan Documents are not ambiguous and it will not admit parol evidence to vary the documents' express terms. For these reasons, the Court sustains the Defendants' objection to Exhibit 95.

Exhibit 116 is a September 17, 2010 email from Dr. Gillum to Paul Ponder and Jeff Fentriss that transmits a cover letter and affidavit, each signed by attorney Mack Ed Swindle. CERx Response to Objection at 2. Similarly, Exhibit 117 is a September 29, 2010 email from Dr. Gillum to Paul Ponder and Jeff Fentriss transmitting the same cover letter and affidavit. The Court concludes that the emails from Dr. Gillum accompanying the documents are merely transmittal emails and not an opposing party's statement, as the emails contain no substance, and sustains the Defendants' objections to the cover emails, CERx App. 731, 737. The Court,

however, will overrule the Defendants' objection to the cover letter and accompanying affidavits. CERx App. 732-736, 738-742.

In the affidavit, which is titled *Affidavit Regarding the Intellectual Property Matters for Provider Meds, LP and OnSiteRx for Use by Prospective Investors of Provider Meds, LP and OnSiteRx* (the "**Swindle Affidavit**"), Mr. Swindle states:

> My name is Mack Ed Swindle. … Our client, Provider Meds, LP (the "Company") has asked that we provide information in connection with the intellectual property of Provider Meds relating to the investment opportunity for investors or prospective investors of Provider Meds, LP and OnSiteRX.

Swindle Affidavit at p. 1; CERx App. 733, 739. Similarly, the cover letter states that "[o]ur law firm has been asked to provide an Affidavit in connection with the intellectual property matters of our client, Provider Meds, LP. Such an Affidavit is enclosed…." CERx App. at 732, 738.

The Swindle documents sufficiently show that Mr. Swindle was authorized by PM to make the statements contained in the cover letter and affidavit. Accordingly, the Court concludes that CERx has carried its burden with respect to the Swindle Affidavit and accompanying cover letter under Fed. R. Evid. 801(d)(2)(D) and overrules Defendants' objection. The Court, however, will not consider Exhibits 116 and 117 to the extent that the exhibits are parol evidence submitted to vary the terms of the May 6 Loan Documents.

Exhibit 118 is an email exchange dated October 5, 2009 between Stewart Stephens and Amar Pai regarding Mr. Pai's acceptance of PM's offer of employment. *Second Declaration of Stewart Stephens* (the "**Stephens Declaration**") at ¶ 4; CERx App. at 817. CERx argues that the correspondence "is relevant to PM's ownership of the intellectual property at issue." CERx Response to Objections at ¶ 3. Based upon Mr. Stephen's declaration, Stephens Declaration at ¶¶ 2-4; CERx App. 817, the Court concludes that CERx has established that Mr. Stephens was PM's employee at the time the email was sent and that the email was sent within the scope of

Mr. Stephens's relationship with PM. *See* FED. R. EVID. 801(d)(2)(D). Accordingly, Defendants' objection to Exhibit 118 is overruled.

Exhibit 128 is an email chain involving Dr. Gillum that allegedly "establishes when the roll up was completed." CERx Response to Objections at 3. The Court concludes that the portions of the email chain authored by Dr. Gillum are excluded from hearsay as a party admission under Fed. R. Evid. 801(d)(2)(D) and, thus, overrules the Defendants' objection as to those portions. The Defendants' objection is sustained as to the remainder of Exhibit 128.

Exhibit 129 is the transcript of a conversation between Dr. Gillum and various other persons, including Cary Lorimer, Randy Gillum, and Jeff Fentriss. CERx Response to Objections at 3. CERx directs the Court to the Fentriss Declaration for testimony regarding this exhibit. CERx App. [Dkt. No. 68] at 7. The Fentriss Declaration, however, does not address why statements by Mr. Lorimer or Randy Gillum would be excluded from hearsay under Fed. R. Evid. 802(d)(2). *See* Fentriss Declaration at ¶ 86; CERx App. at 13. The *Second Jeff Fentriss Declaration*, CERx App. 1183-1184, however, states that "[a]lthough Randy [Gillum] did not hold a formal title at PM, he frequently participated in major meetings and discussions regarding PM's business. To my personal observation, Randy Gillum functioned as a high level advisor to PM." *Second Jeff Fentriss Affidavit* at ¶ 2; CERx App. at 1184.

The Court concludes that CERx has failed to carry its burden to prove that either Randy Gillum or Mr. Lorimer were authorized to make the statements on the call or that such statements were made within the scope of Randy Gillum's and Mr. Lorimer's respective relationships with the Defendants. *See* FED. R. EVID. 801(d)(2)(C), (D). As such, the Court sustains the Defendants' objection to Exhibit 129 with respect to statements by Messrs. Fentriss, Lorimer, and Randy Gillum, but denies the objection with respect to statements made by Dr.

Gillum. To the extent Dr. Gillum's testimony is submitted to vary the terms of the May 6 Loan Documents, however, it is excluded as inadmissible parol evidence.

Exhibit 130 is the transcript of a conversation between Randy Gillum and Jeff Fentriss. Again, CERx directs the Court to the *Second Jeff Fentriss Declaration*, CERx App. 1183-1184, in support of its argument that Randy Gillum's statement should be excluded from hearsay under Fed. R. Evid. 801(d)(2). For the reasons stated in the immediately preceding paragraph, the Court concludes that CERx has failed to establish that statements by Randy Gillum should be excluded from hearsay under Fed. R. Evid. 801(d)(2)(C) or (D). As such, the Court sustains the Defendants' objection to Exhibit 130.

Although the Court sustains several of the Defendants' objections, it notes that much of the evidence CERx sought to admit was in support of its allegation that it was granted a security interest in all of PM's IP Assets pursuant to the May 6 Loan Documents. Even if the Court had overruled all of the Defendants' objections, inclusion of the additional evidence into the summary judgment record would not have changed the outcome on that point, as the Court has concluded that CERx was granted a security interest in all of PM's IP Assets without looking to the additional evidence.

> ### c. Plaintiff's Objection to the Defendants' Additional Summary Judgment Evidence

After the June 17, 2013 hearing, the Defendants attempted to supplement the summary judgment record via their *Supplemental Brief in Response to Plaintiff's Supplemental Briefing* [Dkt. No. 104] (attaching the *Supplemental Affidavit of Reef Gillum, D.O.,* the Collateral Assignment of License Agreement, and a Software License and Services Agreement dated December 29, 2006 by and between the GFMHT and various third parties). CERx objects to the Defendants' supplemental evidence as untimely, and specifically objects to references to prior

drafts of documents as irrelevant and in violation of the "best evidence rule." *See Plaintiff's Objection to Defendants' Additional Summary Judgment Evidence* ("**CERx Objection to Supplemental Evidence**") [Dkt. No. 108].

None of the cases cited in the CERx Objection to Supplemental Evidence, however, stand for the proposition that this Court lacks discretion to admit the supplemental evidence on the basis of its timeliness. FED. R. CIV. P. 56(e), as made applicable by FED. R. BANKR. P. 7056, states that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: give an opportunity to properly support or address the fact…; or (4) issue any other appropriate order." FED. R. BANK. P. 7056(e). Further, N.D. Tex. L.B.R. 7056-1(g) permits parties to file supplemental materials, including additional evidence, with permission of the Court. As such, both the local and federal rules permit this Court to exercise its discretion to consider evidence filed as a supplement. *See Tremont LLC v. Halliburton Energy Svs., Inc.*, 696 F.Supp.2d 741, 790 (S.D. Tex. 2010) (finding that both Rule 56(e) and the local rules of court for that district permit a court to exercise discretion in considering supplemental evidence); *cf. Bernhardt By and Through Bernhardt v. Richardson-Merrell, Inc.*, 892 F.2d 440, 444 (5ᵗʰ Cir. 1990) (finding that the district court did not abuse its discretion in excluding, on timeliness grounds, affidavit that was filed after district court initially ruled on summary judgment motion). As such, the Court, in the exercise of its discretion, does not find the supplemental materials to be time-barred, as argued by CERx. Thus, the Court will admit into the summary judgment record the Collateral Assignment of License Agreement [Dkt. No. 104-2] and the Software License and Service Agreement [Dkt. No. 104-3].

The Court, though, will not admit Dr. Gillum's supplemental affidavit [Dkt. No. 104-1]

into the summary judgment record.  Paragraph 3 of the affidavit is not relevant to the issues before the Court.  Further, the remaining substantive portions of the affidavit seek to improperly introduce evidence that addresses questions raised by the Court at the hearing on the motions, which the Defendants had the opportunity to address at the hearing, and not a party's assertions. *See* FED. R. BANK. P. 7056(e); *Supplemental Affidavit of Reef Gillum, D.O.* at ¶¶ 4 ("The Court has questions…."), 6 ("The Court further questioned…."), 8 ("Finally, the Court has questioned….").  Thus, the Court sustains CERx's objection to Dr. Gillum's supplemental affidavit.

### 3.  Factual History

#### a.  The OnSiteRx System

OnSiteRx, a debtor before this Court (Bankr. Case No. 13-30267), is the ultimate direct and/or indirect corporate parent of various entities that operated in the pharmacy services industry and were engaged in the business of providing remotely distributed and disbursed pharmaceutical products to patient care facilities such as hospitals, long-term care facilities, skilled nursing facilities, retirement facilities, and similar establishments.

In general terms, the OnSite system would provide a care facility and an appropriate central pharmacy with an electronic health record for the pharmaceutical transactions.  The central pharmacy would deliver product to the customers' locations to be stocked in the facility's dispensing machines.  Each receiving facility would have local equipment that would dispense medications in a unit or multi-dose package with patient identifying information such that the facility could then provide fully-dosed patient prescription packages on an as-needed basis.  The non-patent intellectual property underlying the OnSite system is the subject of the parties' cross-

motions for partial summary judgment, particularly the proprietary source code used to operate the system (the "**Source Code**") and any related rights.

### b.    The Prepetition Loans and Security Grant

Between June 2010 and January 2012, CERx loaned approximately $8.92 million in principal amount to PM, which is represented by numerous loan and security documents. Primarily at issue here are the loan and security documents dated as of May 6, 2011 (collectively, the "**May 6 Loan Documents**") comprised of the (1) First Loan Modification Agreement executed by PM, GFMHT, and CERx (the "**FLMA**"), (2) Non-Binding Term Sheet executed by PM, GFMHT, and CERx (the "**Term Sheet**"), (3) Convertible Promissory Note executed by PM and CERx (the "**Convertible Note**"), (4) Patent Application Security Agreement executed by PM and CERx (the "**PSA**"), (5) Collateral Assignment executed by PM (the "**Collateral Assignment**"), and (6) the Collateral Assignment of License Agreement (herein so called).  The most relevant provisions of these documents are as follows:

Pursuant to the PSA:

2.   GRANT OF SECURITY INTEREST. Obligor [PM] hereby grants to the Secured Party [CERx] a lien and security interest in the following (the "Collateral"):

(a) U.S. Provisional Patent Application Serial No. 61/323,125, filed April 12, 2010, U.S. Patent Application Serial No. 13/085,298, filed April 12, 2011, PCT Application No.  PCT/US/2011/032150, filed April 12, 2011, each titled "On Site Prescription Management System and Methods for Health care Facilities," and all continuing patent applications (including, without   limitation, continuation, continuation-in-part    and    divisional    applications),    reissue    applications, **corresponding rights to patent and all other intellectual property protection of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world**, and all patents, registrations, and certificates issuing therefrom (collectively, the "Patent Applications"); and

(b) Any contract rights in, to or under the Patent Applications;

together with all Proceeds, products, offspring, rents, issues, right to recover past damages for infringement, profits and returns of and from any of the foregoing.

PSA at ¶ 2 (emphasis added); CERx App. at 126-127. As did the parties, the Court will similarly refer to the above-referenced assets as the "**Patent Applications.**"[7] The PSA further provides that:

This Patent Security Agreement, together with the First Loan Modification Agreement and the documents referenced therein, constitute the entire agreement between the Obligor [PM] and the Secured Party [CERx] with respect to the subject matter hereof and all other prior and contemporaneous agreements, arrangements, and understandings between the parties hereto as to the subject matter hereof are, except as otherwise expressly provided herein, rescinded.

PSA at ¶ 14(j); CERx App. at 132.

The FLMA required the execution, delivery, and funding of the Convertible Note and execution of the PSA. FLMA at ¶¶ 1, 6; CERx App. at 83, 85. The FLMA also provides that the May 6 Loan Documents "constitute the entire agreement between Borrower [PM] and each Purchaser [including CERx] with respect to the subject matter thereof…." FLMA at ¶ 10; CERx App. at 86.

The Convertible Note (which is referenced in the FLMA) incorporates the Term Sheet and provides that:

Notwithstanding anything contained herein to the contrary, this Note is issued pursuant to the terms of that certain Term Sheet (herein so called) between Borrower and Lenders dated May 6, 2011 and attached hereto as Exhibit "A".

Convertible Note at ¶ 4(k); CERx App. at 76.

In turn, the Term Sheet provides that: "[t]he Guarantor [GFMHT] shall provide the Purchaser [CERx] with **a senior security interest in the IP assets owned by the Guarantor or**

---

[7] For purposes of clarity, the term "Patent Applications" refers to the patent applications and patent-related rights listed in the PSA, but does not include the Source Code or other non-patent related IP Assets.

**any affiliates**….” Term Sheet at ¶ 6 (emphasis added); CERx App. at 79. The parties agree that PM is an affiliate of GFMHT.

CERx also placed a UCC-1 financing statement on file with the Texas Secretary of State, which defined CERx’s collateral in terms nearly identical to that contained in the PSA:

> This FINANCING STATEMENT covers the following collateral: (a) U.S. Provisional Patent Application Serial No. 61/323,125, filed April 12, 2010, U.S. Patent Application Serial No. 13/085,298, filed April 12, 2011, PCT Application No. PCT/US/2011/032150, filed April 12, 2011, each titled "On Site Prescription Management System and Methods for Health care Facilities," and all continuing patent applications (including, without limitation, continuation, continuation-in-part and divisional applications), reissue applications, corresponding rights to patent and all other intellectual property protection of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world, and all patents, registrations, and certificates issuing therefrom (collectively, the “Patent Applications”); and
>
> (b) Any contract rights in, to or under the Patent Applications;
>
> together with all Proceeds, products, offspring, rents, issues, right to recover past damages for infringement, profits and returns of and from any of the foregoing.

UCC-1 Financing Statement, Filing No. 11-0018796992, filed June 27, 2011 (the “**UCC-1**”); Defendants’ App. at 15.

### c. The Prepetition Disposition of Collateral

The various notes became due and payable according to their terms on June 30, 2012, and were not paid. On or about July 1, 2012, CERx caused a Patent Assignment Abstract of Title to be filed with the United States Patent and Trademark Office. CERx App. at 813-815. CERx then served a demand letter on PM and GFMHT on July 6, 2012, informing PM and GFMHT that the loans had matured and demanding immediate payment. CERx App. at 808-811. On October 23, 2012, CERx, via its attorneys, sent a letter to PM (the “**Transmittal Letter**”) informing PM of its intent to dispose of its collateral. CERx App. at 858-859. The Transmittal Letter stated:

Under a Patent Application Security Agreement dated as of May 6, 2011 (Security Agreement), Provider [PM] granted CERx a security interest in certain collateral that includes three different patent applications and the source code and other intellectual property related [*sic*] such applications.

CERx has determined that it is in CERx's best interest to foreclose on all of the collateral granted under the Patent Application Security Agreement. On behalf of CERx, I am transmitting to you herewith a Notification of Disposition of Collateral which sets forth the time, place, and nature of the foreclosure and sale of such collateral.

CERx App. at 858.

Attached to the Transmittal Letter was a Notification of Disposition of Collateral (the

"**Notice of Disposition**"), which stated:

We will sell all of the hereinafter defined "Collateral" to the highest qualified bidder in public as follows:

DAY AND TIME:     December 13, 2012

TIME:                       10:00 a.m. (Dallas, TX time)

PLACE:                    Gardere Wynne Sewell LLP
                                 1601 Elm Street, 26th Floor
                                 Dallas, TX 75201
***

The "Collateral" means (a) U.S. Provisional Patent Application Serial No. 61/323,125, filed April 12, 2010, U.S. Patent Application Serial No. 13/085,298, filed April 12, 2011, PCT Application No. PCT/US/2011/032150, filed April 12, 2011, each titled "On Site Prescription Management System and Methods for Health care Facilities," and all continuing patent applications (including, without limitation, continuation, continuation-in-part and divisional applications), reissue applications, corresponding rights to patent and all other intellectual property protection of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world, and all patents, registrations, and certificates issuing therefrom (collectively, the "Patent Applications"); and (b) any contract rights in, to or under the Patent Applications, together with all Proceeds, products, offspring, rents, issues, right to recover past damages for infringement, profits and returns of and from any of the foregoing.

CERx App. at 861.

On January 7, 2013, CERx sent another letter to PM informing PM that the collateral was sold in accordance with the Notice of Disposition and that CERx was the highest bidder for the assets at the public sale with a credit bid of $750,000. CERx App. at 865-866.

4. **Issues Presented**

a. **Whether PM Granted CERx a Security Interest in All of its IP Assets.**

Under *Southern Rock, Inc. v. B & B Auto Supply*, 711 F.2d 683, 685 (5th Cir. 1983), whether an agreement constitutes a security arrangement is determined with reference to state law. When interpreting a contract under Texas law, the court's primary concern is to ascertain and give effect to the written expression of the parties' intent. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). By this approach, the courts "strive to honor the parties' agreement and not remake their contract by reading additional provisions into it." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). The parties' intent is governed by what is written in the contract, not by what one side contends they intended but failed to say. *Id.* at 127. Thus, "it is objective, not subjective, intent that controls." *Matagorda Cnty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (*per curiam*) (citing *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). A court must therefore give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs., Ltd. P'ship. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). A court does not consider only those parts of a contract that favor one party, *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005), but examines the writing as a whole to harmonize and give effect to all of the contract's provisions. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). The court must consider the contract from a

utilitarian standpoint and bear in mind the particular business activity to be served, and, when possible and proper to do so, avoid a construction that is unreasonable, inequitable, and oppressive. *Frost Nat'l. Bank v. L & F. Distribs., Ltd.,* 165 S.W.3d 310, 312 (Tex. 2005) (*per curiam)*; *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex. 1987).

If a contract is not ambiguous, courts must enforce it as written without considering parol evidence for the purpose of creating an ambiguity or giving the contract "a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (*per curiam)*. Courts determine whether a contract is ambiguous by looking to the contract as a whole in light of the circumstances present when the parties executed it. *Sun Oil Co. (Del.) v. Madeley,* 626 S.W.2d 726, 731 (Tex. 1981). The contract is unambiguous if it can be given a certain or definite meaning as a matter of law. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.,* 389 S.W.3d 802, 806 (Tex. 2012). A contract is not ambiguous simply because the parties advance conflicting interpretations. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex. 1996). If the contract is subject to more than one reasonable interpretation after applying the pertinent rules of contract construction, then the contract is ambiguous and there is a fact issue regarding the parties' intent. *El Paso Field Servs.,* 389 S.W.3d at 806; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

Under Texas law, the principal test for determining whether a transaction is to be treated as a security interest is whether "the transaction intended to have effect as security." *Looney v. Nuss (In re Looney)*, 545 F.2d 916, 918 (5th Cir. 1977) (citing to TEX. BUS. & COM. CODE § 9.102 cmt. 1); *Southern Rock, Inc.,* 711 F.2d at 685. No formal wording is required; the courts are to "examine the substance of the documents, in light of the circumstances of the case." *Looney v. Nuss,* 454 F.2d. at 918. Indeed, a "security agreement need not be evidenced by a

single document; two or more writings, considered together, may constitute a security agreement." *Id.* at 919 n.4 (construing three separate documents to find the parties' objective intent to create a security interest in the absence of a document titled "security agreement").

The Defendants' arguments can be placed into four basic categories. First, the Defendants argue that collateral descriptions contained in the PSA and the Term Sheet[8] are statutorily insufficient to permit CERx's alleged interest in PM's IP Assets to attach, other than with respect to the Patent Applications. According to the Defendants and pursuant to Texas UCC § 9.108(c), "[a] description of collateral as 'all the debtor's assets' or 'all the debtor's personal property' or using words of similar import does not reasonably identify the collateral." TEX. BUS. & COM. CODE § 9.108(c). Thus, the Defendants' posit, the phrases "all other intellectual property," as used in the PSA, or "IP assets," as used in the Term Sheet, are statutorily insufficient to describe the collateral, thus preventing attachment of CERx's alleged security interest in any non-patent related IP Assets.

Second, the Defendants argue that, even if CERx was granted a security interest in PM's non-patent related IP Assets, the collateral description contained in the UCC-1 was insufficient to place a third party on inquiry notice that CERx claimed a security interest in non-patent related IP Assets and, as such, any alleged security interest in the non-patent related IP Assets would be voidable by a hypothetical lien creditor pursuant to 11 U.S.C. § 544.

Third, the Defendants argue that OnSiteRx,[9] not PM, owns the Source Code at issue. According to the Defendants, because OnSiteRx isn't a party to the May 6 Loan Documents, and CERx has filed no UCC-1 financing statement that lists a grant of collateral allegedly given by

---

[8] As discussed below, the Defendants also argue that the Term Sheet is not binding and should not be considered by the Court. The Court disagrees, as explained below.

[9] The Defendants allege that OnSiteRx owns the Source Code and provided a verbal license to PM, who thereafter provided sub-licenses to each operational pharmacy. Defendants' Reply Brief [Dkt. No. 84] at ¶¶ 22-24, 29-33.

OnSiteRx, CERx cannot hold an attached, much less perfected, security interest in the non-patent related IP Assets.

Finally, for the first time in their supplemental briefing [Dkt. No. 104], the Defendants argue that the Term Sheet was "repudiated" by execution of the other May 6 Loan Documents and that the PSA and the Collateral Assignment Agreement supersede the Term Sheet and render it of no legal effect.

CERx, on the other hand, argues that the relevant language of the PSA, standing alone, is sufficient to grant a security interest in the Source Code and other IP Assets, as the terms "intellectual property protection" and "intellectual property" are interchangeable, and the phrase means exactly what it says – that CERx was granted a security interest in all of PM's intellectual property. CERx further argues that the placement of the words "all other intellectual property" in the middle of the collateral description is of no importance.

Second, CERx argues that, in Texas, the collateral description "general intangibles" would have sufficiently described PM's IP Assets pursuant to Texas UCC § 9.108(b)(3), which states that "a description of collateral reasonably identifies the collateral if it identifies the collateral by: (3) … a type of collateral defined in this title." Texas UCC § 9.102(42) defines "general intangibles" to mean "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letter of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software." TEX. BUS. & COM. CODE § 9.102(42). According to CERx, because the larger category of general intangibles is statutorily sufficient, then the subset of "all other intellectual property" must also be sufficient.

Alternatively, CERx argues that, pursuant to both contractual rules of construction applicable in Texas and the "Composite Document Rule,"[10] the May 6 Loan Documents must be integrated and, when read together, clearly show that the parties objectively intended that the security grant include all of PM's IP Assets.

Finally, in its supplemental brief, CERx argues for the first time that the Patent Applications do, in fact, "correspond" to the Source Code because the Source Code allows the Onsite system to communicate with the individual dispensing machines.

The Court agrees with the Defendants that the PSA itself did not grant CERx a security interest in all of PM's IP Assets.   The Court will begin with a reading of the collateral description contained in the PSA:

> U.S. Provisional Patent Application Serial No. 61/323,125, filed April 12, 2010, U.S. Patent Application Serial No. 13/085,298, filed April 12, 2011, PCT Application No.  PCT/US/1011/032150, filed April 12, 2011, each titled "On Site Prescription Management System and Methods for Health care Facilities," and all continuing patent applications (including, without limitation, continuation, continuation-in-part and divisional applications), reissue applications, **corresponding rights to patent and all other intellectual property protection of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world**, and all patents, registrations, and certificates issuing therefrom (collectively, the "Patent Applications");

PSA at ¶ 2 (emphasis added); CERx App. at 126-127.

This Court cannot read the phrase "all other intellectual property" in isolation from the

---

[10] In its briefing, CERx appears to meld the formal "Composite Document Rule," which has not been adopted by the Fifth Circuit or Texas courts, and the general rules of integrated contractual construction under Texas law.  Although the two principles appear to be virtual corollaries, this Court is reluctant to adopt the Composite Document Rule, instead relying on similar precedent established under Texas law.  *See Looney v. Nuss*, 545 F.2d at 918 (determining the parties' objective intent, as reflected in the documents, to create a security interest); *Southern Rock, Inc.,* 711 F.2d at 685 (same); *cf. In re Swersky*, 1999 WL 135260, at * 3 (N.D. Tex. 1999) (unpublished decision) (analyzing the Illinois UCC and discussing the Composite Document Doctrine as adopted by the Seventh Circuit); *but cf. In re Maddox*, 92 B.R. 707 (Bankr. W.D. Tex. 1988) (citing to *Looney v. Nuss (In re Looney)*, 545 F.2d 916, 918 (5th Cir. 1977) in support of integrated contractual construction that the *Maddox* court refers to as the "Composite Document Rule").

rest of the paragraph, but must take its meaning from the surrounding words. *Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 665 n.16 ("Under Texas law, the words of a contract must be read in context…") (citing *U.S. Fid. and Guar. Co. v. Goudeau*, 272 S.W.3d 603, 606 (Tex. 2008) ("Under the traditional canon of construction *noscitur a sociis* ('a word is known by the company it keeps'), each of the words used [in the insurance contract at issue] must be construed in context.")). First, the term "corresponding" must refer to another portion of the paragraph. Here, it clearly refers back to the previously and immediately-listed patent applications. Also, there is no demarcation between "rights to patent" and "all other intellectual property protections;" as such, the entire phrase is limited by the term "corresponding" and expressly relates to the patents. For the phrase to have the meaning posited by CERx, it would read "corresponding rights to patent, ~~and~~ all other intellectual property ~~protection~~ of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world, and all patents, registrations…". The precedent discussed above, however, does not permit such an isolated reading of the phrase "all other intellectual property." *Id.* The plain meaning of this paragraph is that "corresponding rights to patent and all other intellectual property protection of every kind…in all countries of the world" grants exactly what is says -- it grants rights in patents and corresponding rights to patent-like protections in all countries of the world.

The Court's reading of the collateral description as only covering the Patent Applications is further bolstered by other language found throughout the PSA, which also only addresses patent and patent-related rights. CERx App. at 125-136. For example:

- ¶ 5 Representations and Warranties Concerning Collateral "(c) True and correct copies of all papers filed in and received from the USPTO [U.S. Patent and Trademark Office], comprising or relating to the Patent Applications are attached to the Patent Security Application…." PSA at ¶ 5(c); CERx App. at 128.

- ¶ 6 Covenants Concerning Collateral "(d) The Obligor shall execute all such collateral assignments with respect to Patent Applications as the Secured Party reasonably requests in order to perfect the security interest in such Collateral.  The Obligor shall promptly execute for subsequent filing with the [USPTO], such collateral assignments with respect to the Patent Applications as the Secured Party reasonably requests."  PSA at ¶ 6(d); CERx App. at 128.

- ¶ 6 "(e) The Obligor shall use its best efforts in the prosecution and maintenance of all the Patent Applications, and shall promptly provide to the Secured Party or its designated counsel, copies of all correspondence from the USPTO, and all correspondence filed with the USPTO and all other official agencies regarding the Patent Applications."  PSA at ¶ 6(e); CERx App. at 128.

- ¶ 9 Remedies "(b) The Obligor shall execute and deliver on the date hereof to the Secured Party a patent assignment in the form attached hereto as Exhibit A pursuant to which all right, title and interest in and to the Patent Applications shall be assigned permanently to the Secured Party, which executed assignment shall be held by the Secured Party in escrow unless and until the occurrence of a default under this Patent Security Agreement. From and after the occurrence of a default under this Patent Security Agreement, if any, the Secured Party, may, in its sole and absolute discretion, and without notice to the Obligor, record such assignment with the [USPTO]."  PSA at ¶ 9(b); CERx App. at 129.

If the PSA addressed all of PM's IP Assets, as CERx contends, the documents would contain language addressing (or at least referencing) assets other than the Patent Applications. The PSA, however, only addresses patents and patent-related rights.  This patent-specific language is carried through to the patent assignment attached to the PSA as Exhibit A (the "**Patent Assignment**"), which addresses U.S. Patent Application Serial No. 13/085,298, filed April 12, 2011, titled "On Site Prescription Management System and Methods for Health care [*sic*] Facilities."  CERx App. at 135-136.  Further, the Patent Assignment, in its second paragraph, tracks the language of the PSA:

> WHEREAS, CERx … is desirous of acquiring the entire right, title and interest in, to and under said invention and in, to and under the Patent Application, and all continuing patent applications (including, without limitation, continuation, continuation-in-part and divisional applications), reissue applications, **corresponding rights to patent and all other intellectual property protection of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world**…."

CERx App. at 135 (emphasis added).

Neither the PSA nor the Patent Assignment mention or refer to copyrights, trademarks, trade secrets, software, source code, or similar, non-patent related items of intellectual property. Instead, the documents repeatedly refer to and describe patents and rights related to patents. For these reasons, the Court rejects CERx's interpretation of the PSA and holds that, as a matter of law, the PSA did not grant CERx a security interest in PM's non-patent related IP Assets.[11]

Learning from the hearing on the motions for summary judgment that the Court was struggling with its argument concerning the breadth of the grant of a security interest in the PSA, CERx argues in its supplemental brief for the first time that the Source Code "corresponds" to the Patent Applications in that it permits the OnSite system to communicate with the individual dispensing machines. *Plaintiff's Supplemental Brief in Support of its Motion for Summary Judgment* ("**Plaintiff's Supplemental Brief**") [Dkt. No. 99] at ¶¶ 23-25. This argument is very similar to one made by a secured creditor in the case of *The Royal Bank and Trust Co. v. Pereira (In re Lady Madonna Indus., Inc.)*, 99 B.R. 536 (S.D.N.Y. 1989). In *Lady Madonna*, Royal Bank and Trust Co. instituted an adversary proceeding against a bankruptcy trustee, claiming that, via a security agreement, the debtors granted it a security interest in certain trademarks. The security agreement described the collateral as "all of our accounts receivable, contract rights, equipment, and farm products, and any instruments, documents, chattel paper and general intangibles related thereto or arising therefrom…." *Id.* at 538. The bankruptcy court found that the grant of security in "general intangibles" covered trademarks, but only those *related to* accounts receivable and contract rights. *Id.* The issue on appeal was "whether the trademarks

---

[11] For these same reasons, the Court rejects CERx's argument that the Patent Assignment, which contains language identical to the PSA, worked to transfer any rights PM may have held in the Source Code to CERx upon PM's default under the May 6 Loan Documents on June 30, 2012.

and trade name 'Lady Madonna' and 'Baby Madonna' relate to the debtors' accounts receivable and contract rights." *Id.*

The bank argued that the trademarks were related to the accounts receivable and contract rights "since all of the debtors' accounts receivable arose from the sale of 'Lady Madonna' and 'Baby Madonna' branded garments to the debtors' franchisees, who traded under the name 'Lady Madonna' and 'Baby Madonna.'" *Id.* at 540.  In citing to the bankruptcy court's findings, the district court found that this argument was "nothing more than a statement that the accounts receivable might arise in part from the trademarks and trade names, as well as the debtors' inventory, franchise contracts, manufacturing contracts and skills of their employees.…  That argument is nothing more than an assertion that the clause be interpreted to bring in all assets that somehow are used in the making of goods that are sold on credit.  Such a construction would, however, effectively leave the term [related thereto or arising therefrom] without meaning." *Id*. at 541.  The district court then concluded that the trademarks and trade names did not "relate" to the debtors accounts receivable and contract rights.  *Id*.  *See also Sanders v. Comerica Bank*, 274 S.W.3d 861 (Tex. Civ. App. – Ft. Worth 2008) (finding grant in stock certificate and "all inuring to the shares of stock of said corporation, tangible and intangible" to be insufficient to grant a security interest in equipment, despite argument that the equipment, as a corporate asset, inured to the pledged stock).

Similar to the court in *Lady Madonna*, this Court concludes that CERx asks it to interpret the word "corresponding" far too broadly. To find that the Source Code and other intellectual property "correspond" to the patent rights because they interact with or touch upon the patented vending machines would eviscerate the language of the document.

Lastly, CERx argues that the Court must consider the alleged security grant contained in the Term Sheet, which CERx posits is integrated into and modifies the terms of the PSA via the Convertible Note and FLMA by application of the Composite Document Rule and applicable rules of contractual construction. The PSA states that "[i]n the event any term or provision of this Agreement conflicts with any term or provision of the First Loan Modification Agreement, the term or provision of the First Loan Modification Agreement shall control." PSA at ¶ 14(c); CERx App. at 131. The FLMA provides that "[t]his Agreement, the Notes, the Purchase Agreements, the Guaranties, and the other instruments referred to herein constitute the entire agreement between the Borrower and each Purchaser with respect to the subject matter hereof and thereof." FLMA at ¶ 10; CERx App. at 86. The Convertible Note states that "this Note is issued pursuant to the terms of that certain Term Sheet (herein so called) between Borrower and Lender dated May 6, 2011." Convertible Note at 4(k); CERx App. at 76. As such, CERx argues that this incorporation makes the formerly non-binding Term Sheet binding and the Term Sheet must be read to modify the express language of the PSA to grant a security interest in all IP Assets. To do otherwise, according to CERx, would ignore the existence of the express terms of the now-binding Term Sheet.

As an initial matter, the Court notes that there is no conflict between the terms of the PSA and the FLMA. The relevant collateral provisions of the PSA are discussed on pages 20-23, above, and will not be repeated. The FLMA states:

> 6. Additional Collateral. On the date of this Agreement (a) the Borrower [PM] and the Lenders [CERx] shall enter into a Patent Application Security Agreement to grant the Purchaser a security interest in U.S. Patent Application Serial No. 13/085,298, filed by Borrower April 12, 2011 entitled "On Site Prescription Management System and Methods for Health care Facilities" to secure the Borrower's obligations under the Notes….

FLMA at ¶ 6; CERx App. at 85-86. Consistent with the FLMA, the parties entered into the PSA, which granted CERx a security interest in the Patent Applications. There is no inconsistency between these two documents.

The analysis does not end there, however, as this Court is bound by precedent regarding contractual interpretation and must "consider the entire writing and attempt to harmonize and give effect to all provisions of the contract by analyzing the provisions with reference to the whole agreement." *Frost Nat'l Bank,* 165 S.W.3d at 312; *Hackberry Creek Country Club, Inc.,* 205 S.W.3d at 55–56. This Court must also bear in mind the particular business activity to be served (here, a secured commercial loan transaction), and, when possible and proper to do so, avoid a construction that is unreasonable, inequitable, and oppressive. *Frost Nat'l. Bank,* 165 S.W.3d at 312; *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex. 1987). While performing this task, the primary question before the Court is whether the parties objectively intended the transaction to have the effect as security. *Looney v. Nuss,* 545 F.2d at 918 (construing multiple documents to find the parties' objective intent to grant a security interest); *In re Webber,* 350 B.R. 344, 385 (Bankr. S.D. Tex. 2006) (promissory note and stock purchase agreement underlying shareholder's acquisition of co-shareholder's stock evidenced parties' intent to create security interest for co-shareholder in acquired stock, despite non-existence of formal security agreement, given language in documents indicating that payment of note would be secured by stock); *Montavon v. Alamo Nat'l Bank of San Antonio,* 554 S.W.2d 787, 791 (Tex. Civ. App.—San Antonio 1977) (construing multiple documents to find parties' objective intent that certificates of deposit serve as collateral).

Texas UCC § 9.203 details three requirements for the attachment and enforceability of a security interest between the parties: (1) value has been given, (2) the debtor has rights in the

collateral or the power to transfer rights in the collateral to a secured party, and (3) the debtor has authenticated a security agreement that provides a description of the collateral. TEX. BUS. & COM. CODE § 9.203(b). A security interest attaches to the collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment. *Id.* at § 9.203(a). A "security agreement" means an agreement that creates or provides for a security interest. *Id.* at § 9.102(74).

When initially executed, the Term Sheet was a non-binding document that laid out the terms of a potential agreement between the parties regarding a future loan transaction. Term Sheet at ¶¶ 2 ("Purchaser is willing to loan an additional $1,500,000 to Borrower…"), 5 ("Guarantor [GFMHT] shall provide the Purchaser [CERx] with a senior security interest in the IP assets owned by Guarantor or any affiliates…); CERx App. at 66. Although drafted in a future tense, the loan transaction subsequently occurred, as evidenced by the Convertible Note that expressly incorporates the Term Sheet. Convertible Note at ¶4(k) ("Notwithstanding anything contained herein to the contrary, this Note is issued pursuant to the terms of that certain Term Sheet (herein so called) between Borrower [PM] and Lender [CERx] dated May 6, 2011 and attached hereto as Exhibit 'A'. … Additional advances, if any, under this Note shall be made in accordance with the terms of the documents contemplated by the Term Sheet."); CERx App. at 76.

Further, in accordance with Texas UCC § 9.203(3)(A): (1) value has been given via the loans; (2) the debtor[12] has rights in the collateral or the power to transfer rights in the collateral to a secured party (at least with respect to the Patent Applications and other IP Assets that it

---

[12] As relevant here, the Texas UCC defines "debtor" as "(A) a person having an interest, other than a security interest or other lien, in the collateral, whether or not the person is an obligor…." TEX. BUS. & COM. CODE § 9.102(28).

owned);[13] and (3) the debtor has authenticated a security agreement (the May 6 Loan Documents, particularly the Term Sheet) that provides a description of the collateral (the IP assets owned by GFMHT or any affiliates). Although the Term Sheet is not titled a "Security Agreement," the express language used, coupled with the language of the Convertible Note and CERx's funding, clearly shows the parties' objective intent that PM's IP Assets serve as collateral for the loans. That the PSA separately addresses the Patent Applications and the Collateral Assignment of License Agreement separately addresses a license, each a subset of the IP Assets, does not limit the grant of security in the Term Sheet or otherwise create internal conflict or ambiguity.

Here, CERx loaned money, which PM accepted, pursuant to the Term Sheet. That the Term Sheet states "shall grant" and not "is hereby granted" is of no avail, as the Texas UCC does not require an express granting clause (*e.g.,* "debtor hereby grants creditor a security interest"). *Sommers v. Int'l Bus. Mach.*, 640 F.2d 686, 689 (5th Cir. 1981) (concluding that language on a purchase order to the effect that creditor "retains title to said books until paid…" was sufficient to reserve a security interest in books, although bankruptcy trustee argued that granting language was required); *see also Looney v. Nuss,* 545 F.2d at 918 (construing multiple documents to find the parties' objective intent to grant a security interest); *In re Webber*, 350 B.R. at 385 (same); *Montavon,* 554 S.W.2d at 791 (same). The proper analysis is whether the documents show the parties' objective intent that PM's IP Assets serve as collateral for the loans. *Looney v. Nuss*, 545 F.2d at 918. Under the undisputed facts of this case, the May 6 Loan Documents clearly show the parties' objective intent that CERx be granted a security interest in PM's IP Assets.

---

[13] The Court notes that, other than with respect to the Patent Applications, there is no evidence in the summary judgment record from which this Court can determine exactly what assets comprised PM's IP Assets as of December 13, 2012. CERx App. at 126-136, 812; Defendants' App. at 2-3. That issue remains for trial.

For example, in *Montavon v. Alamo Nat'l Bank of San Antonio*, 554 S.W.2d 787 (Tex. Civ. App.—San Antonio 1977), the court found that, based upon several documents, the parties intended that a security interest be granted in certain certificates of deposit, despite the fact that a promised hypothecation never occurred in accordance with the relevant documents. *Id.* at 791. The *Montavon* court found that the creditor bank acquired and perfected (via possession) valid and enforceable security interests in the stockholders' certificates of deposit that served as security for the corporation's debt, where the certificates were delivered to the bank by the stockholders for purposes of securing a line of credit and the stockholders executed a Consent to Pledge and Security Agreement Pledge covering the certificates. The Consent to Pledge, however, stated that the shareholders *authorized the corporation* to hypothecate, pledge and deliver the two certificates. In accordance with Texas precedent, the *Montavon* court construed the documents together in light of relevant Texas UCC provisions and was "influenced by the facts that: (a) the obvious purpose of the delivery of the endorsed Certificates of Deposit to the Bank was to secure a line of credit for Fipco [corporation]; (b) the bank in reliance thereon advanced such credit to Fipco; (c) under the applicable provisions of the Texas Business and Commerce Code, the effect of the delivery of such Certificates, the executed Consent to Pledge, and Security Agreement Pledge, was to perfect a valid security interest in the bank to such Certificates of Deposit to secure Fipco's debt." *Id.* The fact that the Montavons individually pledged and delivered the certificates to the bank, contrary to the express terms of the security documents stating the corporation was to do so, was not persuasive.

Finally, the Court does not find persuasive the Defendants' arguments that the other May 6 Loan Documents refuted or disavowed the Term Sheet. In support of this argument the

Defendants ask that this Court consider the Collateral Assignment of License Agreement.[14]  As argued by the Defendants, paragraph 6 of the FLMA states that: "(b) the Guarantor and the Lender shall enter into a Collateral Assignment of License Agreement to collaterally assign the Guarantor's rights under the Software License and Services Agreement, dated December 28, 2006, by and between the Guarantor and MDI Achieve (Minnesota), Inc. …." FLMA at ¶ 6; CERx App. at 85.  Similarly, the Term Sheet states that "Guarantor shall provide the Purchaser with a senior security interest in the IP assets owned by Guarantor or any affiliates, including but not limited to the License Agreement and all its rights with rights [*sic*] with respect to the related source code, if any, with MDI Achieve."  Term Sheet at ¶ 6; CERx App. at 67.

The Collateral Assignment of License Agreement, however, states that "[a]s collateral security for the Guaranteed Obligations, the Guarantor hereby assigns to Purchasers all of the Guarantor's rights, title and interest in and to the [MDI] License Agreement; provided that the Guarantor does **not** hereby assign, transfer or provide to the Purchaser any Source Code (as defined in the License Agreement)."  Collateral Assignment of License Agreement at B (emphasis added) [Dkt. No. 104-2, page 1 of 4].  According to the Defendants, this exclusion of the MDI-related source code from CERx's collateral package in the Collateral Assignment of License Agreement, despite the language of the Term Sheet and FLMA, reflects the parties' intent that the Term Sheet be superseded by the other May 6 Loan Documents, making the Term Sheet of no force and effect.

The Defendants, however, do not cite to, nor could the Court find, any language in the May 6 Loan Documents, including the Collateral Assignment of License, that objectively refutes or somehow disavows the Term Sheet.  To the contrary, the FLMA specifically references the

---

[14] Collateral Assignment of License Agreement [Dkt. No. 104-2].

Convertible Note and the documents referenced therein, which includes the Term Sheet. The fact that CERx "chose to perfect a security interest in only part of the described collateral in the Term Sheet," Defendants' reply brief [Dkt. No. 104] at ¶ 9, is not a sufficient basis for this Court to ignore the express terms of the May 6 Loan Documents.

Moreover, when referencing the MDI Achieve source code, the Term Sheet recognizes that the guarantor (or its affiliates) will transfer "its rights…, **if any**…"). Term Sheet at ¶ 6 (emphasis added); CERx App. at 67. That the later document – *i.e.*, the Collateral Assignment of License Agreement – confirms that no source code is transferred is not a repudiation of the Term Sheet.

Nor does this Court find persuasive the Defendants' argument that the May 6 Loan Documents, each physically dated as of May 6, 2011, were actually executed on different dates, for the proposition that the PSA and Collateral Assignment Agreement supersede the Term Sheet. This argument is contrary to the face of the documents themselves and this Court will not consider extrinsic evidence as grounds to modify the express and unambiguous terms of the contracts.

### b. Whether the Phrase "IP Assets" Sufficiently Describes PM's Non-Patent Intellectual Property to Permit the Security Interest to Attach.

Pursuant to Texas UCC § 9.108

(a) Except as otherwise provided in Subsections (c), … a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described.

(b) Except as otherwise provided in Subsection (d), a description of collateral reasonably identifies the collateral if it identifies the collateral by: (1) specific listing; (2) category; (3) except as otherwise provided in Subsection (e), a type of collateral defined in this title; (4) quantity; (5) computational or allocational formula or procedure; or (6) except as otherwise provided in Subsection (c), any other method, if the identity of the collateral is objectively determinable.

(c) A description of collateral as "all the debtor's assets" or "all the debtor's personal property" or using words of similar import does not reasonably identify the collateral.

TEX. BUS. & COM. CODE § 9.108. The purpose of requiring a description of collateral in a security agreement is evidentiary. *Id.* at cmt. 2. "The test of sufficiency under this section…is that the description does the job assigned to it: make possible the identification of the collateral described." *Id.* The description need not be in exact detail or serial number. *Id.*

Further, pursuant to Texas UCC § 9.102(42), "general intangible" means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.[15] *Id.* at § 9.102(42). The term "general intangibles" in a secured transaction acts as a "catch-all" and brings under Article 9 miscellaneous types of contractual rights and other personal property that are used or normally may be used as commercial security. *In re Barr*, 180 B.R. 156, 158 (Bankr. N.D. Tex. 1995).

Although it would have been preferable for the parties to use the defined term "general intangibles" in the security documents, failure to do so is not fatal to CERx's argument on this point. This Court concludes that, because the broader "catch-all" of general intangibles would have been a statutorily sufficient collateral description, the subset of general intangibles referred to as intellectual property assets (IP assets) is also sufficient "to do the job assigned to it." *See* TEX. BUS. COM. CODE § 9.108 cmt. 2. Therefore, this Court holds, as a matter of law, that PM granted CERx a security interest in its IP Assets and that such interest attached to the IP Assets in accordance with the applicable provisions of the Texas UCC.

---

[15] Software "means a computer program and any supporting information provided in connection with a transaction relating to the program. The term does not include a computer program that is included in the definition of "goods." *Id.* at § 9.102(76).

### c.     Whether CERx Properly Perfected its Security Interest in PM's IP Assets.

Texas UCC § 9.502 states that a financing statement is sufficient only if it (1) provides the name of the debtor, (2) provides the name of the secured party or a representative of the secured party, and (3) indicates the collateral covered by the financing statement. TEX. BUS. & COM. CODE § 9.502.   Pursuant to Texas UCC § 9.504, a financing statement sufficiently describes the collateral that it covers if it provides either a description of the collateral pursuant to section 9.108 (regarding financing statements) or an indication that the financing statement covers all assets or all personal property. *Id.* at § 9.108.

On June 27, 2011, CERx filed its UCC-1 financing statement with the Texas Secretary of State that contained the following information:

Debtor: Providers Meds, LP

Secured Party: CERx Pharmacy Partners, LP

This FINANCING STATEMENT covers the following collateral: U.S. Provisional Patent Application Serial No. 61/323,125, filed April 12, 2010, U.S. Patent Application Serial No. 13/085,298, filed April 12, 2011, PCT Application No. PCT/US/2011/032150, filed April 12, 2011, each titled "On Site Prescription Management System and Methods for Health care Facilities," and all continuing patent applications (including, without limitation, continuation, continuation-in-part and divisional applications), reissue applications, corresponding rights to patent and all other intellectual property protection of every kind (including, without limitation, all patent applications, industrial models, invention registrations) in all countries of the world, and all patents, registrations, and certificates issuing therefrom (collectively, the "Patent Applications");

(b) Any contract rights in, to or under the Patent Applications;

Together with all Proceeds, products, offspring, rents, issues, right to recover past damages for infringement, profits and returns of and from any of the foregoing.

UCC-1 at p. 1; Defendants' App. at 15.  This language notably mirrors the language in the PSA, but does not contain the broader "IP assets" language contained in the Term Sheet.

CERx correctly points out that the standard for evaluating a collateral description in a financing statement is more liberal than that of judging a collateral description in a security agreement, as the former "need only be sufficient to put a third party on notice that there may be a security interest in the debtor's property…[t]he third party must then make inquiry to discover the complete nature of the agreement between the debtor and his creditor." CERx Supplemental Brief at ¶ 28 (citing *Villa v. Alvarado State Bank*, 611 S.W.2d 483, 486-87 (Tex. Civ. App. – Waco, 1981); *Crow-Southland v. North Ft. Worth Bank.*, 838 S.W.2d 720, 723-24 (Tex. App. -- Dallas 1992) (collateral description in financing statement does not serve to identify the collateral and define the property that the creditor may claim, it simply warns others of the prior security interest). For example, while the term "all the debtor's assets" is statutorily insufficient in a security agreement, TEX. BUS. & COM. CODE § 9.108(c), such a description is sufficient in a financing statement, *Id.* at § 9.504(2).

CERx cites to various cases as analogies as to why the term "all other intellectual property" would put a reasonable third party on inquiry notice regarding CERx's alleged interest in PM's IP Assets. If that is what the UCC-1 said, this Court would agree. However, CERx specifically chose language much more limiting than "all other intellectual property." Further, the Court finds CERx's reasoning on this point attenuated:

> The present case is like *Crow-Southland* in that our words "all other intellectual property" either (a) were alone sufficient or (b) would have put a reasonable person on notice to inquire about what they meant in that long sentence. As discussed above, a third party need only ask what that sentence would mean if the words "all other intellectual property" were omitted to ask why they are there and, once included, what they mean. That inquiry would have led to a dictionary to look up the meaning of "intellectual property" or to the Term Sheet or both. Moreover, Crow-Southland also recognizes, consistent with Texas law, that the phrase "including, but not limited to" is expansive and not limiting. *See id.* The court reasoned that those words in the security agreement were expansive, not limiting, and thus merely referred to a non-exclusive example of the broader description.

Plaintiff's Supplemental Brief at ¶ 31.

For the reasons given in this Court's prior analysis regarding the collateral description contained in the PSA, *see supra* at pp. 28-29, the language in the UCC-1 cannot be read to give inquiry notice that CERx claims an interest in "all other intellectual property," for that is simply not what the UCC-1 says or implies.  Rather, CERx specifically chose to limit the language's application to patent and patent-related rights.  The collateral description chosen by CERx makes no mention of "all the Debtor's assets," "all IP assets," "copyrights," "trademarks," "software," "source code," or other non-patent related assets.  Further, CERx goes on to title its collateral package the "Patent Applications."  Although what parties in privity choose to title something may not be relevant to this Court's analysis regarding attachment; with respect to perfection, this Court concludes that a third party reviewing the UCC-1 would reasonably interpret the term "Patent Applications" to mean patent applications and patent-related rights.

Placement of the words "all other intellectual property protections" in the context chosen by CERx would not raise a red flag to a third party that "Patent Applications" allegedly includes all of PM's intellectual property (such as trademarks, trade secrets, copyrights, source code, etc.). Although specificity is not required in a financing statement, the description must be sufficient to put a reasonable third party on inquiry notice.  TEX. BUS. & COM. CODE § 9.502 cmt. 2;  *Crow-Southland*, 838 S.W.2d at 723-24.

This Court holds that, as a matter of law, the collateral description contained in the UCC-1 is insufficient to give a reasonable person inquiry notice regarding the alleged nature of CERx's security interest in PM's IP Assets, other than the Patent Applications.  However, the failure to perfect as against third parties, standing alone, did not prevent CERx from disposing of

its collateral (PM's IP Assets) at public sale on December 13, 2012, nor does it void the resulting disposition of collateral, to which we now turn.

### d. Whether CERx's Notice of Disposition was Sufficient.

As noted previously, the various notes owing by PM to CERx became due and payable according to their terms on June 30, 2012 and were not paid. On or about July 1, 2012, CERx caused a Patent Assignment Abstract of Title to be filed with the United States Patent and Trademark Office. CERx App. at 813-815. CERx then served a demand letter on PM and GFMHT on July 6, 2012, informing PM and GFMHT that the loans had matured and demanding immediate payment. CERx App. at 808-11. When such payment was not forthcoming, CERx began taking steps to dispose of its collateral under the Texas UCC.

Before a creditor can sell or otherwise dispose of collateral, however, the Texas UCC requires that the creditor send a "reasonable authenticated notification of disposition" to the debtor and other specified entities claiming an interest in the collateral. TEX. BUS. COM. CODE § 9.611(b). Reasonable notification means notification reasonably calculated to give actual notice of the relevant fact to the person responsible for acting upon that fact. *See FDIC v. Lanier*, 926 F.2d 462, 465-66 (5th Cir. 1991) (purpose of notification is to give debtor the opportunity to discharge debt, arrange for friendly purchaser, or to oversee sale to see that it is conducted in a commercially reasonable manner); *Adcock v. First City Bank of Alice*, 802 S.W.2d 305, 307 n.3 (Tex. App. -- San Antonio 1990); *MBank Dallas, N.A. v. Sunbelt Mfg., Inc.*, 710 S.W.2d 633, 635–36 (Tex. App. -- Dallas 1986). Per Texas UCC § 9.613, the notice with respect to non-consumer goods need not be precise – "[t]he contents of a notification providing substantially the information specified in [§ 9.613(1)] are sufficient, even if the notification includes: … (B) minor errors that are not seriously misleading." TEX. BUS. COM. CODE

§ 9.613(3). Further "[a] particular phrasing of the notification is not required." *Id.* at § 9.613(4). Texas UCC § 9.613 sets forth a proposed form of "Notification Before Disposition of Collateral," which appears to generally be the basis of the Notice of Disposition used by CERx. CERx. App. 861-863.

Following the above precedent, the Court concludes that, as a matter of law, the Transmittal Letter and Notice of Disposition were sufficient to give PM actual notice (1) that CERx claimed a lien on "three different patent applications and the source code and other intellectual property related [to] such applications," and (2) of CERx's proposed disposition of such collateral. *See Lanier*, 926 F.2d at 465-66. As discussed above, CERx's lien was valid as between PM and CERx and the lien attached to the collateral. *See supra* pp. 24-40. The fact that the Transmittal Letter states that the lien was granted pursuant to the PSA, versus the Term Sheet, was not seriously misleading as between the parties. Reading the documents together, CERx gave PM reasonable notice that it intended to dispose of PM's IP Assets – including the Source Code – via public sale.

The fact that CERx's liens on certain of its collateral were not perfected as of the December 13, 2012 public sale does not affect the validity of the liens as between CERx and PM or CERx's ability to dispose of its collateral in accordance with the Texas UCC. Notably, the relevant Texas UCC provisions speak in terms of "secured party," which is defined as a person in whose favor a security interest is created or provided for under a security agreement." TEX. BUS. COM. CODE § 9.102(73)(A). A party need only be a "secured party" in order to exercise its rights under a security agreement. *See Id.* at § 9.610(a) ("After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral….;" § 9.611(b) ("a secured party that disposes of collateral under Section 9.610 shall send…a reasonable authenticated

notification of disposition."). Notably, these provisions do not speak in terms of a party holding a perfected security interest, but only a security interest created or provided for under a security agreement.

Further, even if the notice given to PM was somehow deficient, the remedies available under the Texas UCC are specified in § 9.625, titled "Remedies for Secured Party's Failure to Comply with Chapter." When collateral is sold in a commercially unreasonable manner, including if there are deficiencies in notice, the debtor may recover damages or obtain protection from a deficiency judgment, but may not rescind the sale that has been made. *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 456 (Tex. App. – Houston [14th Dist.] 1998) ("Notwithstanding the availability of rescission prior to the adoption of the Uniform Commercial Code and in other areas of the common law, we decline to impose an equitable remedy where the Code provides an adequate legal remedy and at the same time permits additional claims giving rise to equitable remedies as long as the claims do not conflict with the provisions of the Code.") (decided under former Article 9). Further, PM has never challenged the validity of CERx's disposition of its collateral (PM's IP Assets) nor alleged that the disposition was conducted in a commercially unreasonable manner.

Accordingly, the Court concludes that, as a matter of law, CERx acquired PM's IP Assets via its disposition of collateral and public sale that occurred on December 13, 2012.

   e. **Whether CERx's Security Interest in PM's Non-Patent Related IP Assets is Subject to the Debtor's "Strong Arm" Powers Under 11 U.S.C. § 544.**

The Defendants argue that, because CERx failed to perfect its security interest in PM's IP Assets (other than the Patent Applications), debtor PM is "entitled to judgment as a matter of law

on its avoidance actions under 11 U.S.C. § 544 et seq." Defendants' Brief at ¶ 40.[16] A review of the Court's docket, however, reflects that PM has not filed an avoidance action against CERx, nor did the Defendants seek to avoid CERx's unperfected lien in *Defendant's Amended Answer to Plaintiff's Original Complaint, Affirmative Defenses, Counter-Claims, and Third Party Cross Claims* [Dkt. No. 61].[17]

In the Fifth Circuit, however, "[l]eave to amend pleadings 'shall be freely given when justice requires,' " *Whitmire v. Victus Ltd.,* 212 F.3d 885, 889 (5th Cir. 2000) (quoting FED. R. CIV. P. 15(a)), and even if not explicitly stated, a request for leave to amend may be inferred when a party raises new claims in its response to a motion for summary judgment. *See Stover v. Hattiesburg Pub. Sch. Dist.,* 549 F.3d 985, 989 n.2 (5th Cir. 2008) (finding it proper for the district court to consider and rule on a claim made for the first time in response to a motion for summary judgment); *Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972) (concluding that the district court should have construed a legal theory set forth for the first time in response to a summary judgment motion as a motion to amend the pleadings and granted it as such). Accordingly, the Court will infer a request for leave to amend the Defendants' counterclaims by virtue of the § 544 argument in the Defendants' Brief.

Whether to grant the Defendants' inferred request for leave to amend their counterclaims is determined by the following standard:

> In the absence of any apparent or declared reason—such as undue delay, bad faith
> or dilatory motive on the part of the movant, repeated failures to cure deficiencies
> by amendments previously allowed, undue prejudice to the other party by virtue

---

[16] Although Defendants refer to § 544 "*et seq.*," they fail to address any alleged Chapter 5 cause of action other than avoidance of an unperfected security interest pursuant to the "strong arm" powers of 11 U.S.C. § 544.

[17] The Court notes that the Chapter 7 trustee of the PM bankruptcy estate has filed *Trustee Reed's Amended Motion for Leave to File Amended Answer, Counterclaim, Cross-Claim and Third Party Claim, and Brief in Support* [Dkt. No. 153], to which CERx has objected [Dkt. No. 155]. That matter, however, is not currently before the Court.

> of allowance of the amendment, futility of amendment, etc.—the leave sought
> should, as the rules require, be "freely given."

*Whitmire*, 212 F.3d at 889 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Here, the Court

concludes that the § 544 allegations were not raised in Defendants' Brief for purposes of delay,

or with bad faith or dilatory motive.  Moreover, CERx cannot claim surprise or undue prejudice

with respect to the Defendants' § 544 arguments.  The Defendants raised these allegations on

multiple occasions, with the Court permitting briefing on the issue at the conclusion of the June

17th hearing.  Defendant's Brief at ¶¶ 39-43, p. 24; Plaintiff's Brief at p. 20; Plaintiff's

Supplemental Brief at ¶¶ 26-34.  Indeed, the Court expressed its concerns regarding this issue

multiple times at the June 17th hearing:

> There's a further "but" or open issue, … because you [CERx] didn't file a UCC-1
> that is specific with respect to the documents, and therefore can't the debtor-in-
> possession avoid your unperfected lien, even assuming I can construe the security
> agreement and the term sheet together in such a way that you had the grant of a
> lien but it was unperfected on the petition date because the UCC-1 isn't broad
> enough, and as a result of that you still don't end up where you want to be, which
> is a lien on anything more than the patent applications, the way I'm reading the
> UCC-1 and the security agreement?  So that's the third or fourth open issue."

Hr'g Trans. June 17, 2013 at 14:18-15:3; 117:23-118:16 (listing the issue as a matter for briefing

and stating "[i]f it was an unperfected lien,… was it unperfected on the date of the bankruptcy

such that the Trustee can cut off your rights?").  Although CERx's supplemental brief addressed

the sufficiency of the collateral description contained in the UCC-1, it chose not to brief the

avoidance issue under § 544.  *CERx Pharmacy Partners, LP's Reply Regarding its Supplemental

Motion for Partial Summary Judgment Brief* [Dkt. No. 107], at ¶¶ 30-35 ("The UCC-1

Sufficiency Issue").  Accordingly, the Court will consider Defendants' § 544 arguments as a

motion to amend their counterclaims, which is granted.

Section 544 of the Bankruptcy Code provides that:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by – (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simply contract could have obtained such a judicial lien, whether or not such a creditor exists.

11 U.S.C. § 544(a)(1).  In a Chapter 11 case, the debtor in possession holds the strong-arm powers. 11 U.S.C. § 1107(a).  Under § 544, the debtor can avoid any conveyance as a hypothetical lien creditor if the conveyance is unperfected when the case begins.  *In re Casbeer*, 793 F.2d 1436, 1439 (5th Cir. 1986) (citing 11 U.S.C. § 544).

Texas law provides that an unperfected security interest is subordinate to the rights of a person who becomes a lien creditor before the security interest is perfected. TEX. BUS. & COM. CODE § 9.317(a)(2); *In re Biggerstaff*, 2004 WL 3209524 (Bankr. N.D. Tex. 2004).  Therefore, in order to maintain an interest in property senior to that held by a debtor as a hypothetical lien creditor, a creditor must possess a perfected security interest on the date the debtor files its bankruptcy petition.  *In re Stanton*, 254 B.R. 357, 361 (Bankr. E.D. Tex. 2000).

However, a debtor must claim an interest in the property in order to recover it under the strong arm clause.  *See Angeles Real Estate Co. v. Kerxton*, 737 F.2d 416, 418-19 (4th Cir. 1984) (trustee unable to avoid transfer when absolute assignment had been accomplished prepetition) (analyzed under Bankruptcy Act); *Carolson v. Southwest Mobile Homes (In re Melvin)*, 64 B.R. 104, 106-07 (Bankr. W. D. Mo. 1986) (to recover property as lien creditor, trustee must claim title through debtors); *In re Armstrong*, 56 B.R. 781, 785 (Bankr. W.D. Tenn. 1986) ("The trustee's status as a hypothetical lien creditor under § 544(a) extends only to property included in the estate, as determined by § 541); *In re Northern Acres, Inc.*, 52 B.R. 641, 648 (Bankr. Mich. 1985) ("even though the properties held by the debtor in possession are subject to unperfected

liens, the debtor in possession may not use the lien avoidance powers of § 544(a) to set them aside because, on the facts of this case, the properties were not property of the estate as of the commencement of the case."). Because CERx's public sale of the IP Assets occurred on December 13, 2012, prior to the commencement of PM's bankruptcy case, and CERx purchased the IP Assets at the public sale, the IP Assets did not become property of the PM bankruptcy estate. Thus, as a matter of law, the Court concludes that the Chapter 7 trustee of the PM bankruptcy estate may not avail herself of the strong-arm powers of § 544 with respect to the IP Assets that were subject to CERx's prepetition public sale.

## III. CONCLUSION

Based upon the summary judgment record before it, the Court hereby concludes that:

A.  Pursuant to the May 6 Loan Documents, PM granted CERx a security interest in all of its IP Assets.

B.  The security interest granted by PM to CERx pursuant to the May 6 Loan Documents attached to PM's IP Assets and was enforceable by CERx against PM pursuant to Texas UCC § 9.203.

C.  Although CERx's lien in PM's IP Assets attached, CERx failed to perfect its liens in PM's IP Assets other than the Patent Applications.

D.  In accordance with the Transmittal Letter and Notice of Disposition, CERx disposed of all of PM's IP Assets at the December 13, 2012 public sale.

E.  Due to the December 13, 2012 public sale of PM's IP Assets, the Chapter 7 trustee of the PM bankruptcy estate may not avoid CERx's liens on the IP Assets pursuant to the strong-arm powers of 11 U.S.C. § 544.

F.      Other than with respect to the Patent Applications, there is a material issue of fact regarding what assets comprised PM's IP Assets that were subject to the December 13, 2012 public sale, including whether or not the Source Code was owned by PM at the time of that sale.

An order and/or judgment reflecting this ruling shall follow.  The Court hereby directs the parties' counsel to confer with each other and attempt to submit an agreed order and/or judgment consistent with this ruling to the Court within ten days of the entry of this Memorandum Opinion on the Court's docket.  If no agreement can be reached, each party shall submit its own proposed order and/or judgment on or before the tenth day after entry of this Memorandum Opinion on the Court's docket, along with an explanation of why the other side's proposed order and/or judgment is improper.


# # # END OF MEMORANDUM OPINION # # #